579 So.2d 1025 (1991)
Charlotte Martinez, Wife of/and Adrien M. DuBOIS, Individually and as Administrators of the Estate of Their Minor Child, Adrien Scott DuBois
v.
Teri Waterman, Wife of/and John M. McGUIRE.
No. 90-CA-0959.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1991.
Rehearing Denied June 18, 1991.
*1026 George Pivach, II, Joyce M. Cossich, Pivach, Cossich & Pivach, A Professional Corp., Belle Chasse, for appellants.
Brian J. Waid, Bubrig and Waid, Buras, for appellees.
Before BARRY, CIACCIO and ARMSTRONG, JJ.
CIACCIO, Judge.
This is a suit for personal injuries instituted by the parents of a nine year old child who was bitten by a dog owned by John and Teri McGuire. The principle issue in this case is whether the Plaquemines Parish Government ("PPG") is liable for injuries sustained by plaintiffs' minor son. For the following reasons, we reverse the judgment of the trial court which holds the PPG liable for these injuries and dismiss plaintiffs' suit.
The facts surrounding this unfortunate accident are virtually undisputed. The record reflects that John and Teri McGuire lived in a residential neighborhood in the Citrus City subdivision in Buras, Louisiana, which is located in Plaquemines Parish. In 1983, they purchased a Doberman Pinscher dog by the name of Seagrams which they kept in their yard which was completely enclosed by a four foot fence. At the time of the accident, the McGuires were in the process of erecting an eight foot fence which remained incompleted.
On the afternoon of February 25, 1986, Scott DuBois was playing with several friends in an empty lot located across the street from the McGuire home. Scott lived with his family a few houses away and across the street from the McGuires, and had seen the McGuires' dog Seagrams on previous occasions. Scott DuBois testified that while he was playing, he saw Seagrams jump over the fence next to the McGuire home and begin barking and chasing a stray dog in the neighborhood. A few moments later, Jennifer McGuire came out of the house and began calling for Seagrams to return home. When Seagrams failed to respond, she held the dog by his collar and began to pull him towards the house. After it was apparent to Scott that Jennifer was unable to move the dog any further, he decided to attempt to help Jennifer. At this point, the testimony is in dispute. Scott DuBois testified that Jennifer asked him to help her move the dog. Jennifer McGuire stated that she did not ask Scott for his help, but that he voluntarily did so. In any event, as Scott approached Jennifer and Seagrams, the dog bit him.
Mr. and Mrs. Adrien DuBois subsequently brought this suit against the McGuires for the injuries sustained by their son Scott in this attack. The record indicates that the McGuires failed to answer this suit, and plaintiffs obtained a default judgment against them in the amount of $200,000.00. Prior to the confirmation of the default, plaintiffs amended their suit to name as defendant the Plaquemines Parish Government, who plaintiffs alleged failed to adequately enforce the parish ordinance on regulation of animals which resulted in *1027 Scott's injuries. PPG answered this petition, denying plaintiffs allegations and alleging that the cause of the accident was the negligent actions of Scott DuBois and the negligence of his parents in failing to properly supervise their child. By agreement of the parties, the matter was bifurcated for trial, and on July 1, 1988 the trial judge heard testimony solely on the issue of PPG's liability for this accident. The question of damages was deferred to a later date, and has not yet been adjudicated.
The trial court rendered judgment in favor of plaintiffs, finding that the PPG had failed to adequately enforce its applicable ordinance relative to the regulation of animals. On appeal, the PPG contends that it is immune from liability pursuant to the provisions of La.R.S. 9:2798.1, and that notwithstanding the immunity statute, it was not negligent in the enforcement of the ordinance, and therefore was not liable for the injuries sustained in this accident.
The trial court, in imposing liability on the parish for the actions of this animal, relied on the Plaquemines Parish Government's enactment of an ordinance concerning animals within the parish. The applicable provisions of this ordinance which is contained in the Plaquemines Parish Code are as follows:
ARTICLE III. DOGS AND OTHER ANIMALS
DIVISION 1. GENERALLY
* * * * * *
Sec. 5-33. Owner's or keeper's responsibility generally.
The owner or keeper of a dog shall have such dog confined within his yard or enclosure, or secured by a chain therein, or if said dog is allowed outside of said enclosure, it shall be under leash, muzzled and shall be accompanied by his owner or keeper.
Sec. 5-41. Violations.
The owner or keeper of a dog, and any other person violating the provisions of this article, shall be deemed guilty of a misdemeanor, and upon conviction for such offense, before any court of competent jurisdiction of the parish, shall be fined not more than twenty-five dollars ($25.00) and, in default of payment of such fine, condemned to imprisonment in the parish prison for a term not exceeding thirty (30) days, or both fine and imprisonment in the discretion of the court. (Ord. No. 86, Sec. 17, 3-14-68)
* * * * * *
DIVISION 3. IMPOUNDMENT, DESTRUCTION, ETC.
Sec. 5-66. Generally.
(a) Any dog found on the streets, roads, highways or in parks or other public places within the parish without leash and unaccompanied by its owner or keeper or unmuzzled, shall be seized and impounded by the parish health department or its agents.
* * * * * *
Sec. 5-67. Power of health department to patrol street and catch dogs.
The parish health department or its agents shall have power and duty to patrol the streets, roads and highways of the parish with proper and suitable dog wagons, to employ proper agents, and shall have the power to perform all such acts that may be necessary to efficiently catch and impound all stray or homeless dogs which may be found in the streets, parks or public places of the parish. (Ord. No. 86, Sections 6, 16, 3-14-68)
Sec. 5-68. Destruction of vicious dogs.
The parish health department, or its agents, shall destroy any vicious dog found in violation of this article, which cannot be safely taken up or impounded. (Ord. No. 86, Sec. 15, 3-14-68)
The reference for these ordinances was obtained from state statute, La.R.S. 3:2731, et seq. relative to the power of a local authority to regulate dogs. La.R.S. 3:2731 provides:
The governing bodies of all parishes and municipalities may levy and collect annual per capita license taxes on all dogs, enact ordinances for the regulation of *1028 dogs running at large, and maintain pounds for the impounding of dogs.
Further, La.R.S. 3:2773 provides:
Dogs owned by citizens of this state and by citizens of other states and situated and located in this state are declared to be personal property of such citizens. However, any citizen may, and the sheriff, constable, or other police officers of any parish, ward, or municipality shall, seize any dog found unaccompanied by its owner or keeper and running at large on any road, street or other public place, or trespassing on any premises other than the premises of the owner. If the dog is wearing a collar bearing a tag showing the name and address of its owner, it shall be impounded and the citizen or officer so seizing and impounding the dog shall immediately thereafter by written notice notify the owner of the dog, at the address disclosed by the tag on the dog's collar, that the dog has been seized and impounded by him and unless the owner or keeper of the dog shall, within seven days from the receipt of the notice, claim the dog and pay the citizen or officer a fee of one dollar for seizing and a fee of twenty-five cents for each day it is impounded it shall be disposed of in any humane manner. Any citizen or officer may kill any dangerous or vicious dog, and no citizen or officer shall be liable to damages or to prosecution by reason of killing any dangerous or vicious dog.
The trial court, in its written reasons for judgment (which are attached hereto as Appendix A), stated "that under the Parish Animal Ordinance as written the dog catcher has the right and duty to seize and impound a dog which he had reasonable cause to believe had been running at large or was otherwise in violation of the ordinance." The court further found that once the ordinance had been violated by an owner of an animal who was found running loose, "it was incumbent upon the dog catcher or his supervisors to at least seek enforcement under Section 5-41" of the ordinance which imposed criminal penalties on the owner for violating the provisions of the ordinance. The court concluded that the issuance by the parish authorities of a "confinement notice" to the owners of this animal was insufficient and "that the failure of the Parish Government to adequately enforce its ordinances led directly to Scott's injuries." We disagree.
The PPG contends on appeal that the parish's decision to implement the use of the confinement notice was an exercise of discretion within the course and scope of their lawful powers and duties as conferred by state statute. As such, the parish argues that it is immunized from liability under the provisions of La.R.S. 9:2798.1. Plaintiff argues that the immunity afforded public entities under this statute is an affirmative defense which the public entity must specially plead.
Our review of the record indicates that the defense of public immunity was not contained in PPG's pleadings. However, at trial, there was substantial testimony by the representative of the parish government concerning the policy decisions made by the parish in its attempt to implement the ordinance. We find that the specific testimony on the issue of the policy-making decisions of the parish, which was admitted by the trial court without objection of counsel for plaintiffs, to have enlarged the pleadings to include the defense of public immunity. La.C.C.P. art. 1154.
Under La.R.S. 9:2798.1, public entities are generally not liable for their policy-making or discretionary acts except when these acts are not reasonably related to the legitimate governmental objective or where the acts constitute "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless or flagrant misconduct." La.R.S. 9:2798.1(C). A majority of the Supreme Court, on rehearing, in the recent decision of Fowler v. Roberts, 556 So.2d 1 (La.1989) held a government agency liable for the acts of its employee, reasoning that the entity had failed to make a policy decision or exercise an act of discretion so as to invoke the application of the immunity statute.
We find the decision in the Fowler case to be distinguishable from the situation *1029 presented here, where there is ample evidence in the record that the governmental entity in this case made a policy decision and exercised an act of discretion in enforcing this ordinance.
The state legislature conferred authority on the local governments for the licensing, regulation and impoundment of dogs. La. R.S. 3:2731. Pursuant to this statute, the PPG enacted this ordinance to regulate dogs within the parish. Under the provisions of this ordinance, the parish had the authority, commensurate with its exercise of reasonable police power, to regulate and impound stray dogs and dogs who are found unaccompanied by their owners and therefore in violation of the ordinance. Pursuant to the directives of this ordinance, the Parish Health Department established an administrative procedure to facilitate the enforcement of this ordinance.
Evidence adduced at trial indicates that in enforcing this ordinance, the parish hired small animal wardens who were responsible for patrolling the streets of the parish and responding to complaints concerning dogs who had been found running at large. Ms. JoAnn McMichael, the assistant administrator of the Health Department at the time of this incident, testified that the department's "policy was to follow up complaints received in the office and issue a confinement notice" to the owners of animals believed to have violated the ordinance. Although Ms. McMichael testified that there was no written procedure, the policy of the department once the animal warden found a dog who was properly licensed running loose was to return the dog to its owners' premises and issue a "Rabies Control Confinement Notice" instructing the owner to keep the dog confined within the owner's yard or to secure the dog with a chain. (See Appendix B)
The determination of a procedure to enforce this ordinance is a discretionary function of the parish government. The ordinance did not prohibit the Health Department from adopting an enforcement policy to achieve the objectives set forth in the ordinance, i.e., the regulation of dogs within the parish. The implementation of the confinement notices is a policy-making act on the part of the parish, which we find to be reasonably related to the governmental objective. There has been no showing that this decision on the part of the parish constitutes willful or reckless misconduct. Under these circumstances, we find that the department's actions in implementing this procedure to enforce their ordinance are protected by the immunity provisions of La.R.S. 9:2798.1.
Further, we find that the trial judge's conclusion that the health department could have implemented more rigorous enforcement measures under the ordinance is not a proper inquiry for the trial court. Under the immunity statute, the court may only ascertain whether the acts of the governmental agency were discretionary or policy-making decisions, and if so whether they were reasonably related to the governmental objective or constituted misconduct on the part of the entity. In the present case, we find the evidence supports the conclusion that the department's use of the confinement notice was a reasonable exercise of the discretion afforded the parish in enforcing the ordinance.
Plaintiffs allege that the parish should have either impounded Seagrams for violating the ordinance or notified the proper authorities to institute proceedings to charge the McGuires with a misdemeanor. However, the determination of whether to impound a dog is a discretionary function of the parish government in conjunction with the enforcement of this ordinance, which we find has not been shown to be unreasonable. Further, plaintiffs cite no authority which holds that the failure to bring criminal charges may result in civil liability. This decision is normally within the discretion of enforcement officials. Under the express provisions of La.R.S. 9:2798.1, the parish government in this case cannot be held liable for their reasonable exercise of discretion in implementing this ordinance.
Even assuming for the purposes of argument that the immunity statute is not applicable, which we find not to be the case, plaintiffs have nonetheless failed to show that the actions of the parish were *1030 negligent so as to permit recovery. Our review of the record indicates that prior to the incident which forms the basis of this lawsuit, the parish had received complaints on four occasions concerning the dogs owned by the McGuires. On each occasion, an animal warden was dispatched by the parish to investigate the complaint. The first such instance occurred on August 28, 1981, but did not involve the dog Seagrams. The record does not divulge the basis of this complaint, but it does indicate that this instance involved one of the McGuires' other dogs.
The first instance which involved Seagrams occurred on October 14, 1984. On that date, the parish received a complaint that a "Doberman was running loose." An animal warden was dispatched to the scene, found the Doberman to be Seagrams, and issued a confinement notice to Mrs. McGuire, instructing her to keep the dog confined on her premises. The animal warden noted on her report of that instance that the dog chased her, but there is nothing in the record which indicates that Seagrams manifested any dangerous propensities at this time or that the animal warden believed he might be vicious or in need of further evaluation.
The second instance involving Seagrams occurred on December 17, 1984. The complaint form indicates that a Doberman was running loose attacking the complainant's dogs. The same animal warden who investigated the first instance was sent to the scene, and Mrs. McGuire was issued a second confinement notice by the parish concerning the dog Seagrams. However, the record is devoid of any evidence which indicates that the dog Seagrams exhibited any dangerous tendencies at this time, or that the animal warden believed the dog to be creating a dangerous situation by attacking another dog.
The next incident occurred almost one year later on November 26, 1985. The report of this incident indicates that Seagrams got out of his pen, ran through the McGuire's house through the front door and began fighting with a stray dog. Mr. Joe Dingler, who lived in the neighborhood, attempted to break up the fight, and was bitten by one of the dogs. The report to the parish on the date of this incident which Dingler signed stated that Dingler was not sure which dog bit him. However, at trial he disputed this statement and testified that he knew the dog who bit him to be Seagrams. He stated at trial that the other dog involved in the fight was not a stray, but rather his own dog "Chester." However, Dingler does not state that he informed the animal warden at the time of the incident that Seagrams had bitten him, and the animal warden specifically testified at trial that Dingler told her he did not know which dog had bitten him. We find nothing in the record to show that Seagrams had bitten anyone such that the parish should have taken additional enforcement action against him. Following this incident, and with the written consent of Dingler, the parish allowed Seagrams to remain with the McGuires and issued a notice to the McGuires to "securely confine" Seagrams for ten days for observation for possible rabies infection.
The final incident involving Seagrams occurred almost three months later, on February 25, 1986, when Scott was bitten. The evidence in the record indicates that shortly before the attack, Mrs. McGuire had put Seagrams on a leash which she secured to the fence. This incident occurred when Seagrams slipped the collar on his leash and jumped the fence, apparently to chase a stray dog.
Generally, the owner of an animal is the party responsible for the tortious acts of the animal. Under the provisions of La.C.C. art. 2321, the "owner of an animal is answerable for the damages he has caused; ...," and when an animal causes harm to another, the owner is presumed to be at fault and is strictly liable therefor. Holland v. Buckley, 305 So.2d 113 (La. 1974). Further, the owner has a legal obligation to keep his animal under such "garde" that it does no damage to others. La.C.C. art. 2321; Rozell v. Louisiana Animal Breeders Co-op., 496 So.2d 275 (La.1986).
The only basis for imposing liability on the parish for the actions of this animal requires a showing that the conduct of the parish or its employees in enforcing its ordinance was negligent and that such negligence *1031 caused the damages herein. We find that the evidence presented at trial indicates that the parish adequately complied with the provisions of this ordinance by the use of the confinement notices which were issued to the McGuires following each incident involving their dogs. Prior to Scott's injuries, the parish had no reason to believe that Seagrams was a dangerous animal or that he had a propensity for biting humans or that further action was necessary to prevent this occurrence. There is nothing in the record which indicates that the animal wardens who investigated the incidents involving Seagrams knew or should have known by Seagrams' actions that he was a dangerous animal or that he needed to be evaluated or impounded. In fact, the warden who handled the Dingler incident stated that she did not believe that a dog who ran loose or chased other dogs was exhibiting vicious tendencies.
In support of their position, plaintiffs introduced expert testimony of Dr. Harold Blappert who examined Seagrams after this incident and opined that Seagrams was an animal fighter and fear biter who had dangerous propensities. He states that the parish should have known of these propensities after Dingler was bitten in November of 1985. However, although the trial court believed Dingler's testimony at trial that he was sure that it was Seagrams who bit him, the report submitted to the parish at the time of the incident which Dingler signed indicated that he was not sure which dog had bitten him. At the time of the incident involving Scott, the only notice that the parish had concerning Seagrams was that he had been reported to be running loose and fighting with other dogs. Prior to the attack on Scott, the parish had no notice that Seagrams had manifested a vicious temperment or had a dangerous propensity for biting humans.
In addition, following the attack on Scott, the parish immediately impounded Seagrams and sought to have him destroyed. On motion of the McGuires, the trial court enjoined the destruction of the dog. The court, in its reasons for judgment, stated:
"... the Parish Health Department had no authority, and hence no duty, to determine if Seagrams was `vicious' and needed to be destroyed at any time prior to the attack on Scott DuBois."
Once Seagrams had been safely taken up and impounded, the only action that could be taken by the parish under the ordinance was to observe the dog for rabies infection and then return him to his owners.
The plaintiffs cite Serpas v. Margiotta, 59 So.2d 492 (La.App. 4th Cir.1952) wherein the court held liable under a similar ordinance an agency of the government whose employee personally observed an obviously rabid dog yet refused to impound or destroy it, and the dog bit a child two hours later. Under these circumstances, the court found that the agency owed a special duty to plaintiff because of the negligence of the employee in failing to impound this animal who was known to be dangerous. We find the Serpas case to be distinguishable from the one before us where there is no evidence in the record which indicates that prior to the attack on Scott the dog Seagrams had manifested a vicious temperment which should have alerted the parish to the fact that he was a dangerous animal or likely to bite humans. A specific duty arose in Serpas when the government employee observed the obviously dangerous animal. Unlike Serpas, there has been no showing that the parish employees knew or should have known that Seagrams was dangerous, and therefore the instant case involves no special duty which arose between the parish and this particular citizen which allows the imposition of tort liability on the parish.
The ordinance in this case is a general regulatory statute enacted for the public health, safety and general welfare the purpose of which is to keep strays and other dogs from roaming the streets of Plaquemines Parish. The intent of the parish government in enacting this ordinance was not to impound each and every dog found running at large. Rather, we find that the parish intended by this ordinance that stray dogs are removed from the streets and that dogs who are properly licensed are returned to their owner's premises with instructions to confine the dog. This ordinance does not make the parish the insurer *1032 of a dog that manages to escape from his owner's premises. The only way that the parish could have guaranteed that this biting incident would not have occurred would be to destroy this animal, which they had no authority to do.
In carrying out the provisions of this ordinance, the parish authorities have the discretion to implement the appropriate procedures to insure substantial compliance with the ordinance and must act reasonably in discharging this duty. Absent a showing that the conduct of the parish employees in enforcing the ordinance was negligent and that the negligence had a causal relationship with the injuries, the parish cannot be held liable for the actions of this animal.
We find that the trial court's finding that the parish failed to adequately enforce its ordinance to be manifestly erroneous. We have thoroughly reviewed the record in this case and have found no evidence which indicates that the parish employees knew or should have known that this dog was dangerous, yet failed to take appropriate action. We find that by dispatching animal wardens to the scene where a complaint was received and by issuing confinement notices to the dog's owner, the parish exercised due and reasonable care in fulfillment of its general duty to keep dogs from roaming the streets of the parish. Absent any evidence that the employees of the parish who investigated these incidents knew or should have known that the dog had dangerous propensities which could foreseeably cause the injuries here, the parish had no specific duty to impound Seagrams or take further enforcement action against the McGuires.
In addition, we find that the trial court erred in finding a causal connection between the actions of the parish employees and the resulting harm to this child. Prior to this biting incident, three months had elapsed from the last time Seagrams was reported to the parish authorities, presumably without incident.
The record indicates that immediately prior to this incident, Seagrams was leashed to a fence within the McGuire's yard as required by the ordinance. If the parish had impounded the dog prior to the attack on Scott, they had no authority to keep it permanently or to destroy it, and would have been required to return him to his owners. Further, even if the parish had initiated proceedings to charge the owners with a misdemeanor for these violations of the ordinance by allowing their dog to run loose, there is no guarantee that the dog would not have nonetheless escaped the confines of the owners' premises and caused injuries such as the ones here. We find that the trial court's conclusion that additional enforcement action by the parish could have prevented this biting incident by causing the McGuires to use more effective methods of restraining their dog to be mere speculation. Absent a specific duty, we decline to hold the parish government liable for the negligence of the owner who fails to properly secure his animal.
For the foregoing reasons, we find that under the provisions of La.R.S. 9:2798.1, the Plaquemines Parish Government is immune from liability for the exercise of its policy-making decisions. Further, we find that the trial judge was clearly wrong in concluding that the parish failed to adequately enforce its ordinance, thereby causing injuries to this child. Accordingly, the judgment of the trial court is reversed. Plaintiffs' suit against the Plaquemines Parish Government is dismissed at plaintiffs' costs.
REVERSED.

APPENDIX A

Twenty-Fifth Judicial District Court

Parish of Plaquemines

State of Louisiana

No. 28-890

Division A.

Charlotte Martinez, Wife of/and Adrien M. DuBois, individually and as Administrators of the Estate of their minor child, Adrien

Scott DuBois

v.

Teri Waterman Wife of/and John M. McGuire
 /s/ Merlene M. Barthelemy
 Deputy Clerk

*1033 Filed: Jan. 31, 1990.

REASONS FOR JUDGMENT
On February 25, 1986, nine year old Scott DuBois was savagely mauled by a three year old Doberman Pincher named "Seagrams" owned by Mr. & Mrs. John M. McGuire. The child was hospitalized several days at Plaquemines Parish General Hospital in Port Sulphur with numerous stitches and an infection. He was subsequently transferred to Meadowcrest Hospital in Gretna and treated by a plastic surgeon, Dr. Dupin. The dog attack has left Scott conspicuously scarred in the face making him the subject of teasing, taunting and ridicule.
On April 24, 1986 Scott's parents filed suit both individually and on his behalf against the McGuires. Although they were briefly represented by counsel, who filed a motion for an extension of time within which to plead, the McGuires never answered and the attorney withdrew from representation. A default judgment against the McGuires was confirmed on November 26, 1986 in the principal sum of $200,000.
Prior to the confirmation of the default, the Plaintiffs amended their petition to add as a party defendant the Plaquemines Parish Commission Council (now referred to as the Plaquemines Parish Government). The cause of action against the Plaquemines Parish Government was based upon alleged facts that the said defendant had adopted certain ordinances concerning the regulation of animals which were supposed to be enforced through the Parish Health Department. It was asserted that on "numerous" occasions prior to the attack on Scott, the Plaquemines Parish Government had been notified that the McGuires' Doberman was loose or had assaulted some person or animal, yet the defendant took no enforcement action of any kind against the McGuires or their dog. It was specifically alleged that had the Plaquemines Parish Government enforced its ordinances the attack on Scott would never have taken place.
Essentially the Parish government contended that the ordinances were not violated because the McGuires never "permitted" Seagrams to run at large (he had always escaped) and the Parish's dog catcher never found Seagrams in a public place. Therefore, it was asserted the Parish could not seize the dog pursuant to the ordinances.
The plaintiffs argued that at some point prior to the attack on Scott DuBois the Parish should have found the dog to be "vicious" and ordered it destroyed. In this regard the plaintiff produced the testimony of Harold Blappert, Jr. an expert canine trainer and an expert in the behavior of attack-type dogs. Blappert testified that Seagrams was a "fear biter" and an animal fighter, conditions that usually develop when a dog is a puppy. These conditions made the dog unpredictable in behavior and "out of control". Blappert concluded that Seagrams was a vicious dog and that this fact should have been obvious to a properly trained animal warden as early as November 26, 1985 when Seagrams bit Mr. Joe Dingler. Blappert also asserted that Seagrams' propensities as an animal fighter should have been conspicuous to a properly trained animal warden based upon prior complaints and investigations by the dog catcher. Blappert asserts the dog should not have been released back into the neighborhood without, at least, an expert evaluation by a canine trainer.
The Parish Government asserts that the dog could not be destroyed if the McGuires could show that they could safely impound him.
At this point it must be noted that in another suit, No. 28-810, this Court enjoined the Parish Government from destroying Seagrams. That suit was brought by the McGuires against the Parish government after Seagrams was seized and impounded following the attack on Scott. The McGuires had initially been told that the dog was going to be held for rabies observation. Later, they were informed that the Parish officials had determined the dog to be vicious and had ordered its destruction.
*1034 The applicable statutes and ordinances are as follows:
R.S. 3:2773.
Dogs as personal property; ... dangerous or vicious dogs.
Dogs ... are declared to be the personal property of such citizens. However, any citizen may, and the sheriff ... shall seize any dog found unaccompanied by its owner ... and running at large ... on any premises other than the premises of the owner.... Any citizen or officer may kill any dangerous or vicious dog and no citizen or officer shall be liable to damages or prosecution by reason of the killing of any dangerous or vicious dog.

Section 5-36 [Plaquemines Parish Code of Ordinances] Unauthorized killing.
It shall be unlawful for any person other than an agent of the Parish Health Department to kill any dog by shooting or poisoning at any other place than the dog pound, provided that any person may kill a mad dog.

Section 5-37 Animals biting persons or being bitten by a rabid animal.
It shall be the duty of the Parish Health Department ... to impound ... any dog or other animal that has bitten a human being ... or which has been bitten by any animal having rabies.... If such animal so impounded shows indications of rabies, it shall be the duty of the health department to destroy such animal.

Section 5-68 Destruction of vicious dogs.
The Parish health department ... shall destroy any vicious dog found in violation of this article, which cannot be safely taken up or impounded.

Section 5-70 Disposal of unredeemed dogs

Any dog not redeemed within five (5) days after being taken shall be destroyed or otherwise disposed of by the Parish health department.
It is clear to the Court that in the state statute, R.S. 3:2773, the authority to kill vicious dogs was meant to be exercised in emergency situations where the dog was attacking someone or someone's property. Basically it is a recognition of the right of self defense, defense of others or defense or property. The Court's view is reinforced by virtue of the fact that the only three reported cases on the subject occur in that context. See Collier v. Hoffman, 482 So.2d 922 (La.App. 2d Cir.1986); Chaisson [Chiasson ] v. Widman 376 So.2d 350 (La. App. [3rd] Cir.1979) Evans v. Litton, 334 So.2d 717 (La.App. [2nd] Cir.1976). In each of these cases dogs were killed while they were attacking children or farm animals.
With respect to Section 5-36 of the Parish Code, the proviso about killing mad [rabid] dogs is simply an exception to the general rule established that no one may kill dogs by shooting or poisoning except at the dog pound. In the context of this case there is no duty imposed by this section on any one.
The next section imposes the affirmative duty on the Parish health department to destroy rabid animals. There is no suggestion that Seagrams had rabies or that he had been bitten by a rabid animal. Thus, this statute has no application to this case.
Section 5-68 is the authority relied upon by the Plaintiff to assert that the Defendant Plaquemines Parish Government had a duty to destroy Seagrams before he bit Scott DuBois. However, the clear and unambiguous language of the section indicates that it has no application to the facts of this case. It is quite clear to the Court that this section merely restates the rule of R.S. 3:2773: Authority is conferred to destroy an animal which cannot be impounded safely when the animal is found in violation of the Parish's animal control ordinance. To invoke the ordinance, the alleged or perceived viciousness must occur contemporaneously with the dog catcher's attempt to apprehend the dog. Again, this is a self defense measure designed to protect the health and safety of the animal warden in the performance of his duties.
There is no other authority in the code of ordinances to identify and punish vicious dogs. It is for that reason that this Court enjoined the destruction of Seagrams after he had bitten Scott. The dog was already *1035 in custody. Obviously he had been "taken up or impounded" safely. Whether he was found in violation of the ordinance (at large, unattended) is disputed, but immaterial, since under Section 5-37 the health department had the mandatory duty to impound and observe him for rabies since he had bitten a human being.
The only other provisions of the Parish code authorizing the destruction of an animal is 5-70. It likewise does not apply to this case since it purports to permit the destruction of animals that have in fact been found in violation of the ordinance, impounded and remained unclaimed for a specified time.
For the above reasons the Court finds that the Parish Health Department had no authority, and hence no duty, to determine if Seagrams was "vicious" and needed to be destroyed at any time prior to the attack on Scott DuBois.
The next major argument asserted by plaintiff is that the Parish Government took no enforcement action against Seagrams or his owners. The record reflects that between August 28, 1981 and February 25, 1986, dogs owned by the McGuires were reported to the Health Department a total of 5 times (including the attack on Scott).
The first report was August 28, 1981. This report could not have involved Seagrams because he was not born until 1983. Not much is known about the substance of this complaint, but a "Rabies Control Confinement Notice" was given to Mrs. McGuire.
October 14, 1984 is the date of the dog catcher's next visit to Mrs. McGuire. This one involved Seagrams. Another "Rabies Control Confinement Notice" was issued. The exhibit, P-5, bears a notation "Doberman running loose." The dog catcher's daily report for that date with respect to this complaint notes that the dog chased her. See exhibit P-4.
Two months later there was another complaint to the Health Department regarding Seagrams. The complaint form, exhibit P-6, indicates that a Doberman was running loose attacking the complainant's dogs. The disposition was another "Rabies Control and Confinement Notice." This one bears the handwritten notation in the upper right corner "2nd Notice."
The next incident occurred almost a year later on November 26, 1985. This report (exhibit P-9) indicates that Seagrams got out of his pen, entered the McGuires' house and ran out the front door to start a fight with a stray dog. The report goes on to state that Mr. Joe S. Dingler was bitten on the left calf. The report says Mr. Dingler "was breaking up a dog fight and he is not sure which dog bit him. One dog is a stray. I got a give away." Both the animal warden, Agnes Perkins, and Mr. Dingler signed the form beneath the quoted statement.
Mr. Dingler testified at trial and contradicts the statement above quoted. He admits breaking up a dog fight, but says it was definitely Seagrams who bit him because he was holding the other dog by its collar. He disputes that the other dog was a stray, claiming it was his own dog, "Chester." The fight that he was breaking up occurred at his front door while Seagrams was attacking his dog.
There is no clear explanation for the discrepancy between the statement that appears on exhibit P-9 and Mr. Dingler's testimony. However, the report notes that it was filled out at 8:30 P.M. and the bite occurred at 5:00 P.M. Perhaps the different versions of the events occurred because of the time lapse between the event and the filling out of the report. In any event, the Court believes Mr. Dingler has the more accurate version of the events, even though the dog catcher did take a "stray" into custody.
In connection with the Dingler bite the McGuires were permitted to keep Seagrams at their home on their written promise to "securely confine" him for ten days for observation for possible rabies infection. Mr. Dingler signed a statement that he agreed to such arrangement and released the Parish Government from any responsibility.
The final visit occurred February, 1986 when Scott was bitten.
*1036 The use of the "Rabies Control Confinement Notice" is peculiar. The notice appears on stationery of the Plaquemines Parish Health Department. It purports to notify a dog owner to have his animal confined in accordance with the ordinance and that a "re-check" will be made within forty-eight hours. No where in the animal control ordinance is such a notice described, authorized or mandated as a part of the enforcement mechanism.
Even more peculiar is the fact that the use of the confinement notice is not the subject of a written policy of either the Parish Government or the Health Department. It is an amorphous policy that came to be used on occasions when the dog that the dog catcher was summoned to apprehend was back on private property upon the arrival of the dog catcher. Mrs. Agnes Perkins, a former parish dog catcher and the one involved in the Dingler bite case testified that she understood the ordinance to provide for impoundment of dogs only when the dog catcher actually encountered the dog off its owner's property.
Mrs. JoAnn McMichael testified that there was no policy to govern when the "confinement notices" were to stop and other enforcement action would be taken.
The Court has concluded that the officials responsible for enforcement of the Animal Control Ordinance understood that they had only one enforcement tool, seizure and impoundment of a dog; and that this tool was not available to them unless the dog catcher personally encountered the animal in a public place (street, road, highway, parks or other public place).
This interpretation and application of the dog catcher's authority is more narrow than the ordinance's plain verbage. Section 5-66 of the Parish code provides "any dog found on the streets, roads, highways... without leash and unaccompanied by its owner ... shall be seized and impounded...." Section 5-67 states "the Parish Health Department ... shall have the power and duty to patrol the streets, roads and highways ... and shall have the power to perform all such acts that may be necessary to efficiently catch and impound all stray or homeless dogs which may be found in the streets, parks or public places...." These ordinances do not, on their face, require the dog catcher to be the exclusive person to do the finding. If that were the intent, then it seems that the ordinance would read "any dog found by the animal warden...." or ".... catch and impound all stray or homeless dogs which may be found by the animal warden in the streets, etc."
In the regulatory and enforcement scheme as it existed at the time of Scott's injuries it seems to the Court it would be a rare occasion indeed that a dog would still be in a public place (as defined in the ordinance) when the dog catcher arrived after receiving a public complaint. To limit the dog catcher's authority to seize and impound only those dogs he or she fortuitously encountered in a public place is inane. After all a human being may be arrested and carted off to jail without a warrant when a peace officer has reasonable cause to believe he has committed an offense, even though the officer was not present for the commission of the illegal act. See C.Cr.P. 212. To say that animals enjoy greater rights than humans is ludicrous. Thus, the Court has concluded that under the Parish Animal Control Ordinance as written the dog catcher has the right and duty to seize and impound a dog which he had reasonable cause to believe had been running at large or was otherwise in violation of the ordinance. Certainly "reasonable cause" could be based upon eye witness reports to him of the errant dog running loose or upon any other facts giving him "reasonable cause to believe" the dog had violated the ordinance.
Even if one accepts the interpretation of the Health Department that the dog catcher had to actually see or find the dog in public, seizure and impoundment was not the only enforcement tool available to the dog catcher. Section 5-41 of the Parish code punishes violations of the Animal Control Ordinance as a misdemeanor with fine of not more than twenty-five ($25.00) dollars and/or imprisonment for not more than thirty (30) days.
*1037 There is no evidence that the Parish ever invoked or tried to use these penalties against the McGuires, or anyone else for that matter. If one assumes, arguendo, that the restrictive interpretation of the Health Department's enforcement authority is correct (which the Court does not accept), then at the very least the Court believes it was incumbent upon the dog catcher or his supervisors to at least seek enforcement under Section 5-41. This could have been accomplished by reporting the matter to the Sheriff's office, the District Attorney's office or by swearing out a complaint before the Justice of the Peace. There is no evidence that any such action was ever done or attempted, even though the McGuires had a four-complaint record with the Health Department and Seagrams had a three-complaint record before the incident involving Scott. Certainly by the time of the Dingler bite reasonable prudence demanded something more than a "confinement notice" which by its very use pursuant to the vague guidelines established by the Health Department presumed that a violation of the ordinance had occurred.
The Court believes that the failure of the Parish Government to adequately enforce its ordinances led directly to Scotts' injuries. If at some point an enforcement method more rigorous than the vapid "confinement notice" had been used against either the McGuires or Seagrams the Court believes it is more probable than not that the McGuires would have used more effective methods to restrain the dog and keep him on their property. The use of the innocuous confinement notice so many times came to reinforce in the McGuires that there really were no consequences for not obeying the Animal Control Ordinance. They did not have to make sure Seagrams was confined because if and when he got loose (again) they would only get another piece of paper saying "you should follow the law." The failure to take more severe enforcement measures against Seagrams and his owners contributed in a very real way to Scott DuBois' injuries.
Judgment accordingly.
Jan. 31, 1990.
 /s/ Michael E. Kirby
 Judge

*1038 APPENDIX B