633 So.2d 1382 (1994)
Wanda Ann Songy POLK, Wife of/and John Polk, Jr., Individually and as Natural Tutors of Their Minor Child, Jai Garrett Polk
v.
Dianne BLANQUE and State Farm Mutual Automobile Insurance Company.
No. 93-CA-1740.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 1994.
Writ Denied May 20, 1994.
*1383 Leopold Weill, III, New Orleans, for plaintiffs-appellants.
Philip D. Lorio, III, Deutsch, Kerrigan & Stiles, New Orleans, for defendants-appellees.
Before BYRNES, JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
This is an appeal from a judgment of the trial court granting the motions of the New Orleans Jazz and Heritage Foundation (Foundation) and Fair Grounds Corporation (Fair Grounds) for summary judgment dismissing the original and four supplemental and amending petitions of plaintiffs Wanda Ann Songy Polk, wife of/and John Polk, Jr., individually and as legal co-tutors of their minor child, Jai Garrett Polk.
Plaintiffs filed suit in October, 1988, against the driver, Dianne Blanque (Blanque), and insurer of a car that struck from behind the automobile in which Wanda Polk was a passenger on Interstate Highway 610 (I-610) approximately ½ mile from its St. Bernard Avenue exit ramp. In April, 1989, plaintiffs filed a first amended and supplemental petition for damages adding fourteen defendants, including, inter alia, the Foundation, Fair Grounds and City of New Orleans (City), the manufacturer of the automobile in which Polk was riding, Blanque's parents, and insurers. All added defendants have settled or been dismissed, with the exception of the Foundation, Fair Grounds and City.
In support of its judgment, the trial court stated on the record:
"I just don't see a duty.... Nothing you said has changed my mind. I just don't think they have a duty."
Judgment was read, rendered and signed on June 4, 1993, dismissing plaintiffs' petitions against the Fair Grounds and the Foundation. From this judgment, plaintiffs appeal.
We affirm because, as a matter of law, defendants did not owe a duty to these plaintiffs, and plaintiffs failed to offer proof to establish genuine issues of material fact as to the issues of causation in fact, duty and scope of duty.

*1384 SUMMARY OF THE PLAINTIFFS' CLAIMS

Plaintiffs seek to hold the dismissed defendants, the Fair Grounds and the Foundation, liable for having in fact caused Mrs. Polk's injury.
On April 23, 1988, Mrs. Polk was an automobile passenger traveling to the Jazz and Heritage Festival (Jazz Fest) being held at the New Orleans Fair Grounds. Between 11:30 and 11:45 a.m., plaintiffs claim that the car in which Mrs. Polk was riding came to a stop at the end of a line of stopped vehicles in the right hand travel lane of I-610, approximately ½ mile from the St. Bernard Avenue exit ramp. The car was struck from behind by a car driven by Blanque, causing the Polk vehicle to strike the car in front of it and to crash into a concrete abutment to the right of the highway. Plaintiffs allege that Mrs. Polk suffered brain damage as a result of the accident. Plaintiffs compromised their claim against Blanque, who was dismissed from the suit.
The Foundation staged the Jazz Fest on property owned by the Fair Grounds, under a bilateral contract which provides in pertinent part:
The Fair Grounds requires the Foundation to use only one public entrance to the Fair Grounds parking lot;
Keys to Fair Grounds locks on entrance gates used by Foundation and Fair personnel are made available to Foundation as well as to Fair Grounds security personnel for use in case of emergency, but the Fair Director, a Foundation employee, will exercise control over the opening and closing of these gates;
Fair Grounds shall employ a NOPD motorcycle policeman to patrol the outside fence during the hours of the event;
Fair Grounds will employ and furnish free of cost to Foundation but subject to the administration and unrestricted control of Foundation, the Fair Grounds parking crew to insure that cars are properly parked;
All vehicles of Fair patrons will be directed to enter through the Gentilly gate and exit through designated Fortin Street gates;
Other logistic particulars of this agreement may be modified, in writing, by mutual agreement of Fair Grounds and Foundation as necessitated by changes that may occur from year to year in the scope of the Fair and its events and in the physical layout of the Race Track, such as gates of entry;
Fair Grounds and/or Louis Roussel, III, personally, its or his heirs or assigns or its or his successors in business or through other businesses belonging to Louis Roussel, III agrees to contribute $50,000 per year[1] to the Foundation for as long as the Foundation continues the use of the infield premises as its exclusive site for the presentation of the Spring Jazz Fest, in return for which Fair Grounds or other Roussel designee shall be recognized as a sponsor of Jazz Fest.
Plaintiffs contend that through the actions of the Fair Grounds and Foundation employees who planned the event, and the members of the paid police details they engaged to handle traffic and security, and through the actions of taxpayer-paid police officers, a foreseeable traffic stoppage occurred which backed up through the St. Bernard Avenue exit ramp from the I-610, beyond the exit and onto the interstate highway for approximately one-half mile to the point where the vehicle in which Mrs. Polk was riding had stopped. Plaintiffs contend further that defendants knew or should have known through their experiences of past Jazz Fest traffic problems that such traffic stoppages would occur, and owed and breached a duty to Mrs. Polk, who was in the traffic jam, albeit ½ mile BEYOND the highway exit nearest to the Fair Grounds property, and approximately one and one-half miles from the Fair Grounds site itself.[2]
*1385 Plaintiff submitted the affidavit testimony of Celeste Ford, a fellow passenger with Mrs. Polk in the car driven by Don Boudreaux. Ford testified that each time she came to the Jazz Fest in 1985, 1986 and 1987, the traffic was backed up onto I-610 East, in the right hand lane of travel.
Stephen Henriques' affidavit shows that he was riding on I-610 East in the middle lane as he approached the Wisner Boulevard overpass on the day of the accident. A pickup truck ahead of him, traveling at about 55-60 miles per hour, suddenly swerved into the middle lane to keep from striking cars that had come to a stop in the right hand lane of travel. The next car swerved too late and ran into the Boudreaux car.
Clarence Barrow, who lives at 3170 St. Bernard Avenue, about 1 block south of the I-610 in the direction of Gentilly Boulevard signed an affidavit that from 1978, when he moved to that address, and through 1988, he observed that on weekend days of the Jazz Fest, heavy traffic congestion occurred in the right hand lanes of St. Bernard Avenue from the corner of St. Bernard Avenue and Gentilly Boulevard from about 10 AM to 1 PM each day.
Plaintiff and defendants submitted extracts of the depositions of Elbert Ray Holman, Felix Lociano, Everett Coffman, Wayne Jusselin, Diane Blanque and Joseph Vallelungo.
Holman was assistant chief of field operations for the NOPD from May, 1986 until his retirement in November, 1989. In 1980, he was contacted by Frank Heyward, Jazz Fest's security consultant, to take over the Jazz Fest police detail. About 1986, he expanded the front gate personnel, and introduced advance ticket sales in an effort to streamline automobile entry to the Fair Grounds. In 1988, he was acting in his capacity as a policeman on a private detail for the Foundation, and was responsible for the control of traffic entering the Fair Grounds parking lot from the Gentilly Boulevard gate. He testified that he answered to Foundation officials Nancy Oschsenschlager and Quint Davis, who told him which gates were to be opened.
Holman said the decision not to open the gates to vehicular traffic earlier than at most 10 minutes before 11:00 was made by Foundation management, and only two of the four Gentilly Boulevard gates were used to admit cars to paid on-site parking.
Holman's uncontroverted testimony established that the purpose of the private detail security officer at Belfort Street was to allow Jazz Fest workers to turn left off Gentilly Boulevard to enter the Fair Grounds through the Belfort Street gate; patrons of the festival were to enter through the Gentilly gates. The Foundation-paid private detail had no jurisdiction or control past Belfort Street. The traffic control duties of the private detail did not extend beyond the immediate vicinity of the Gentilly entrance, where they acted to expedite movement of traffic into the Fair Grounds parking area, where the Foundation's parking crew assisted drivers in finding places to park on the grounds of the festival. The record reflects that the number of paid detail officers hired by the Foundation was approved by NOPD.
The record is clear that the NOPD had the duty to control traffic BEYOND the Fair Grounds property. The NOPD planned, supervised and controlled the intersections at Gentilly Boulevard, St. Bernard Avenue and DeSaix Boulevard; Gentilly Boulevard and Belfort Street; North Broad Street and Columbus Street; North Broad Street and Gentilly Boulevard/Bayou Road; Paris Avenue and Gentilly Boulevard; North Broad Street and Esplanade Avenue, and Esplanade Avenue and Moss Street pursuant to the NOPD Operations Order identified as respondents' exhibit I. The I-610 exit serving the Fair Grounds area, and the I-610 itself in that area, however, were not within the coverage *1386 area of the NOPD's special operations order. The City was responsible for these city road assignments manned by regular duty officers of the NOPD.
Major Lociano was part of the NOPD special operations task force, not the Foundation-paid detail. He testified that the problem of traffic congestion at the entrance to the Jazz Fest was common knowledge prior to 1988 among officers familiar with the festival, and was in fact the motivation for the posting of the private detail on Gentilly Boulevard and the posting of taxpayer-paid officers at DeSaix Circle; however, there is no evidence of record that the traffic problem extended beyond that area, or in any event reached the interstate highway. Lociano's officers handled traffic duties in the special coverage area described above, which did not include any part of I-610. Lociano believed the number of police officers on duty on the day of the accident was adequate, and testified that the Foundation had never refused any request for additional officers for the Jazz Fest.
Plaintiff contends that on-site parking was grossly inadequate to the demand, and offered as evidence of defendants' awareness of this fact the Foundation's Responses to Plaintiff Interrogatories, showing attendance of over 57,000 patrons, and admission of only 3,160 vehicles to the on-site parking throughout the day. However, the evidence is uncontroverted in Villalungo's deposition that the parking on the day of the accident was approximately 100 fewer vehicles than the following day, and over 200 fewer than the next Sunday of the festival. Plaintiff also assumes without offering proof that everyone who attended the festival arrived in an automobile. Plaintiff failed to offer any evidence that public transportation and the various Jazz Fest shuttles failed to alleviate a significant portion of the plaintiff's alleged parking demand.
Plaintiff contends that the Foundation's actions in opening the gates at 11:00 a.m. and using only the Gentilly gates illegally obstructed the highway in order to provide "temporary parking" for the Jazz Fest. There is no evidence of record that there was a constant line of traffic from the parking area to the Boudreaux vehicle on the interstate highway. Even assuming this to be the case, the only evidence concerning these actions shows no breach of duty by the Foundation or Fair Grounds to persons travelling on the interstate highway. Holman's deposition testimony is not controverted: prior to the opening of the Gentilly gates to the public, it was necessary that vendors be allowed the opportunity to service their booths without endangering passersby. All heavy equipment and service vehicles were to be removed from the infield area, and ticket takers were to be in place prior to 11:00 a.m. The only evidence adduced shows that as soon as this was accomplished, between 10:50 and 11:00 a.m., according to Holman, patrons were admitted to the parking area. As the tide of traffic ebbed and flowed, loudspeaker announcements informed those coming toward the entrance as to the availability of on-site parking.
Patrons arriving before the 10:50-11:00 a.m. opening of the gates, and who wished to park on-site, were allowed to wait in the parking lane and extreme right lane of Gentilly Boulevard in the direction of North Broad Street. The two remaining lanes of Gentilly Boulevard remained open at all times for through traffic. Thus, the parking lane and extreme right hand lane of Gentilly Boulevard accommodated traffic going towards the two Gentilly gates, while the two lanes to the left accommodated through traffic. There is no evidence to support plaintiffs' allegation that the Foundation and/or Fair Grounds completely blocked the traffic arteries to create temporary parking for the festival.
The investigating officer, Everett Coffman, testified that it is common knowledge that all public events, such as the Jazz Fest, involve some traffic congestion, and that he was on routine patrol the day of the accident and did not notice any out-of-the-ordinary traffic buildup. He was not aware of any other accidents in the area that day, and could not make the determination that the traffic congestion was, in fact, caused by the Jazz Fest's operation.

*1387 LEGAL DUTY OF THE EVENT PRODUCER AND OF THE LANDOWNER

Under the duty/risk analysis adopted in our civilian jurisdiction, the liability of the Foundation and of the Fair Grounds must be grounded on some duty to Mrs. Polk. Absent a duty to plaintiffs, there can be no actionable negligence and hence no liability.
In making the requisite analysis, the Louisiana Supreme Court in Roberts v. Benoit, 605 So.2d 1032, 1041 (La.1992) directs us to consider four questions:
Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred? This cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact. See, Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). To the extent that the defendants' actions had something to do with the injury plaintiff sustained, the test of a factual, causal relationship is met. See, Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972); Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 292 (La.1993).
Did the defendant owe a duty to the plaintiff? Duty is a question of law: simply put, the inquiry is whether the plaintiff has any lawstatutory or jurisprudentialto support his claim.
Was the duty breached? That is, did the defendants' conduct violate the statutory or jurisprudential duty to the plaintiff?
Was the risk, and harm caused, within the scope of protection afforded by the duty breached? The scope of duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. The courts of Louisiana have held that the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Roberts, supra; Hill, supra; Faucheaux, supra at 293-294.

CAUSE IN FACT ISSUE
The Foundation and Fair Grounds argue that their conduct was not a cause-in-fact of the injury suffered by Mrs. Polk.
The Foundation and Fair Grounds contend that the cause-in-fact of the accident was Blanque's inattention.
While causation issues are determined properly by the trier of fact after a trial at which all relevant evidence can be adduced in an adversarial context, Poland v. Glenn, 623 So.2d 227 (La.App. 2nd Cir.1993); Wilson v. State through Dept. of Public Safety and Corrections, 576 So.2d 490 (La.1991), plaintiff cannot withstand a motion for summary judgment absent some proof that these defendants' actions were a cause in fact of her injury.
Plaintiffs have failed to offer such proof. Plaintiffs have succumbed to the classic "post hoc" logical fallacy. Post hoc, ergo propter hoc, "is an argument that asserts that one event is the cause of another from the mere fact that the first occurred prior to the second."[3] They contend that because there was traffic congestion to which the Jazz Fest contributed, the congestion, and not Blanque, caused Mrs. Polk's injury. Mere temporal relationship does not establish causation.
The issue is not whether there existed traffic congestion at the time of the accident, but whether defendants created a known *1388 traffic hazard AT PLAINTIFF'S LOCATION which caused Mrs. Polk's injury. Plaintiff has not offered any evidence showing such a traffic hazard; there is no evidence of even one prior rear-end collision at or near the site of plaintiff's injury either on the day of the accident or at any prior Jazz Fest. The only evidence addressing this issue is found in the testimony of the public and private detail NOPD officers that there had been no complaints about traffic around the Jazz Fest prior to 1988, or rear end collisions in that area.
There was evidence, from officer Coffman, that it is common knowledge that from time to time the interstate highways running through New Orleans suffer from traffic congestion of various magnitudes. Such common knowledge gives rise to a duty on the part of drivers on these highways to exercise care and to drive prudently at all times. It does not operate to create a duty on the part of the Foundation and the Fair Grounds from their remote location to drivers on those non-adjacent highways.
In affirming a trial court's granting of defendant's motion for summary judgment, this Court discussed "cause in fact," holding:
"The law must place some reasonable limit to the scope of protection envisioned by defendant's conduct. LeJeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). `A particular foreseeable risk may be included [within the scope of a duty] if the injury is easily associated with the rule relied on and with other risks of the same type that are foreseeable and clearly within the ambit of protection.' Forest v. State, through La. Dept. of Transportation, 493 So.2d 563 (La.1986) at 570.
"Here, we assume Taco Bell breached a duty to provide a security guard. It is undisputed that the fight which caused Hebert's injuries and resulting death occurred on the neighboring Joe Brown Park. There was no physical altercation on Taco Bell property. Under these circumstances, we cannot easily associate the lack of a security guard with the harm that befell Hebert. Under the facts of this case, the scope of protection afforded Taco Bell's patrons cannot extend to injuries caused by the intentional, tortious acts of third persons committed off the business premises." Hebert v. Taco Bell Corporation, 613 So.2d 729, 732 (La.App. 4th Cir. 1993).
To hold otherwise would operate to create an absolute duty on the sponsors of all local attractions to persons beyond any reasonable extension of responsibility or foreseeability. Traffic congestion is a necessary, albeit unwelcome, concomitant of the many festivals and special events that mark New Orleans' calendar. What motorist has not encountered expected delays and even total stoppages of traffic on the interstate on the morning of a Saints football game hours before kickoff; or attempted at length to cross Claiborne Avenue during the annual parade commemorating the life and work of the Rev. Dr. Martin Luther King, Jr.; or been trapped in the Poydras Street corridor while the revelers of the Zulu and Rex organizations shower trinkets on massed citizens and visitors to New Orleans? Indeed, such stoppages occur on a daily basis in morning and evening rush hour traffic. It is unreasonable to hold the NFL responsible for inattentive motorists' tortious acts merely because they occurred in traffic approaching the Superdome prior to a Superbowl game. It is likewise unreasonable to impose liability on sponsors of the internationally popular Jazz Fest absent proof of a duty to these plaintiffs and absent proof of causation.[4]
We find Mrs. Polk to be beyond the reasonable limit to the scope of protection envisioned by the Foundation and Fair Grounds in their operation of the Jazz Fest. See, LeJeune, supra 556 So.2d at p. 569.

ISSUES OF EXISTENCE OF A DUTY TO MRS. POLK AND BREACH OF THAT DUTY
Plaintiffs contend that the Foundation's duty is grounded in its having undertaken *1389 to provide traffic control, pursuant to its agreements with the Fair Grounds and NOPD officers. This obligation includes the duty to provide such control, either directly or through its agents and employees, in a non-negligent manner. It is plaintiff's contention, subject to proof, that this duty was breached by Foundation's failure to open the two remaining Gentilly gates that were available to traffic under the governing agreement, and/or to open the gates prior to the 11:00 a.m. opening of the Jazz Fest in order to relieve the traffic buildup that eventually reached the Polk vehicle on I-610.
Plaintiff urges that the Fair Grounds and Foundation owed a duty similar to that owed by Magic City Post No. 24, American Legion, to provide a traffic control plan in Blair v. Tynes, 621 So.2d 591 (La.1993), rehearing denied 625 So.2d 1346 (La.1993)[5] wherein the Louisiana Supreme Court held:
"[T]he lease created an assumed duty to provide security including pedestrian protection in a non-negligent manner. Harris v. Pizza Hut, 455 So.2d 1364 (La.1984).... [B]usinesses undertaking the hiring of security guards to protect themselves and their patrons are liable for physical harm that results from the negligence of the security guards.... [T]he Legion's failure to verify that the deputies had a traffic control plan which included assistance to pedestrians was a substantial factor in causing the accident which killed Mrs. Blair.... Not only is the American Legion negligent in its own right, it is vicariously liable for the actions of the deputies who were special employees of the Legion."
The Blair case supports the trial judge's finding of lack of duty given the uncontroverted facts of the instant case. In Blair, the accident occurred within what the Supreme Court called a "protected neutral zone" created by the deputies hired by the defendants. Had Mrs. Polk been injured within the area controlled by the Foundation's paid detail, Blair would have imposed upon Foundation and Fair Grounds the duty to protect her from traffic in a non-negligent manner; however, the Polk accident occurred NOT ONLY outside the Foundation-paid detail's "protected zone," but also beyond the area included in the NOPD taxpayer-paid area of supervision. Blair, supra 621 So.2d at p. 594.
The Louisiana Supreme Court in Blair found further support for defendants' duty in the law's requirement of special protection for pedestrians, a status Mrs. Polk does not enjoy. Blair, supra at p. 596.
Plaintiffs contend that LSA-R.S. 32:141, which prohibits stopping any vehicle on the paved or main traveled part of the highway when it is practicable to stop outside of the travel lane provides a basis for a legal duty by Foundation and Fair Grounds to Mrs. Polk. The uncontroverted testimony adduced in Holman's deposition shows that the traffic control allowed two lanes of traffic to flow through Gentilly Boulevard. Plaintiff has failed to offer evidence that defendants violated this statute.
Landowners owe a duty not to create a risk to others by obstructing traffic. See, Savarese v. Bye, 398 So.2d 1276 (La.App. 4th Cir.1981). In the Savarese case, high weeds growing on the landowner's property obstructed the view of the motorists involved in the subject accident. There, the duty was owed to victims of an accident occurring adjacent to the landowner's property, caused by the obstruction of the driver's vision by weeds growing on the property itself. Mrs. Polk, at an extended distance from the Fair Grounds property, injured by a driver as to whom there is no proof of impaired vision or ability caused by defendants, is not such a victim.
*1390 We find that the injury suffered by Mrs. Polk is not "easily associated" with the activities of the Foundation or the Fair Grounds.

SCOPE OF DUTY
The defendant's knowledge controlled the scope of duty finding in Sanderson v. Beaugh, 367 So.2d 14 (La.App. 4th Cir.1978). There, plaintiffs sought to impose liability on a stable owner for damages caused by persons shooting at junk located in a pasture leased by the stable owner. This Court held:
"While the operator of a business such as a horse stable conceivably has some duty to his renters or to passersby to stop or to curtail known or frequent dangerous and imprudent use of firearms on his premises, this record does not establish that [the operator] knew or should have known any shooting had ever taken place in Pasture No. 1.... [T]his record simply does not establish any reason for [the operator] to have anticipated that anyone would shoot a gun in the stable and pasture area. Under the circumstances of this case [the operator] had no duty to provide ... against dangerous conduct which he had no reason to anticipate." Sanderson, supra at pp. 17-18.
This result is similar to those in cases involving intentional or even criminal conduct by third parties. Knowledge on the part of the landowner or possessor is a critical sine qua non of liability.
The Foundation and Fair Grounds recognized their duty to those in the vicinity of the Jazz Fest, and provided a privately paid detail of NOPD officers, in numbers approved by the NOPD, to carry out that duty. We find that the scope of that duty does not extend to persons situated similarly to Mrs. Polk, beyond the perimeter of the area controlled by the private paid detaileven beyond the area controlled by the NOPD special operations officers.

STANDARD OF REVIEW
A summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.Civ.P. art. 966(B).
A fact is material if it is essential to a plaintiff's cause of action under the applicable theory of recovery and without which plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Prado v. Sloman Neptun Schiffahrts, A.G., 611 So.2d 691, 699 (La.App. 4th Cir.1992), writ not considered 613 So.2d 986 (La.1993).
In Dibos v. Bill Watson Ford, Inc., 622 So.2d 677, 680 (La.App. 4th Cir.1993), this Court held:
"To satisfy his burden, the party moving for the summary judgment must meet a strict standard by showing that it is quite clear as to what the truth is, and that excludes any real doubt as to the existence of material fact. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981)."
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La. 1991).
When a motion for summary judgment is made and supported with affidavits, depositions and/or answers to interrogatories, the adverse party may not rest merely on the allegations or denials contained in the pleadings. Poydras Square Assoc. v. Suzette's Artique, Inc., 614 So.2d 131, 132 (La.App. 4th Cir.1993).
All evidence and inferences drawn from the evidence must be construed in the light most favorable to the party opposing the motion. Carr v. City of New Orleans, 622 So.2d 819, 822 (La.App. 4th Cir.1993), writ denied 629 So.2d 404 (La.1993). The papers supporting the position for the party moving for the summary judgment are to be closely scrutinized while the opposing papers are to be indulgently treated, in determining whether mover has satisfied his burden. See, Vermilion, supra. Where the trial court is presented with a choice of reasonable inferences *1391 to be drawn from subsidiary facts contained in affidavits and attached exhibits, reasonable inferences must be viewed in the light most favorable to the party opposing the motion. Duvalle v. Lake Kenilworth, Inc., 396 So.2d 1268 (La.1981).
No summary judgment will be granted even if the trial court has grave doubts regarding a party's ability to establish disputed facts. Aydell v. Charles Carter & Co., Inc., 388 So.2d 404 (La.App. 1st Cir. 1980), writ denied 391 So.2d 460 (1980). It is not the function of the trial court on a motion for summary judgment to determine or even inquire into the merits of the issues raised. Morris v. Louisiana Coca-Cola Bottling Co., Ltd., 354 So.2d 659 (La.App. 1st Cir.1977). The fact that a party is unlikely to prevail at a trial on the merits is an insufficient basis for rendering a summary judgment against that party. Chapeuis v. Cassimano, 568 So.2d 606 (La.App. 4th Cir.1990), writ denied 571 So.2d 629 (1990). This is true no matter how small the chances of the party opposing the motion to ultimately prevail appear to be. Dearie v. Ford Motor Co., 583 So.2d 28 (La. App. 5th Cir.1991), writ denied 588 So.2d 1117 (1991).
Likewise, the weighing of conflicting evidence on a material fact has no place in summary judgment procedure. Mecom v. Mobil Oil Corp., 299 So.2d 380 (La.App. 3rd Cir.1974), application denied 302 So.2d 308 (1974).
A motion for a summary judgment is not to be used as a substitute for trial on the merits. Oller v. Sharp Elec., Inc., 451 So.2d 1235 (La.App. 4th Cir.1984), writ denied 457 So.2d 1194 (1984).
Applying the foregoing standards, our complete de novo review of the record supports the trial judge's granting of defendants' motions for summary judgment. Plaintiffs have had the opportunity over a period of several years to complete discovery and to obtain evidence to support their claims, and have failed to provide evidence of any genuine issue of material fact. Defendants have supplied uncontroverted proof that AS A MATTER OF LAW their duty did not extend so far as this plaintiff under these circumstances. A summary judgment is the proper vehicle to resolve the dispute among the parties. We find no error in the trial court's judgment, and affirm.
AFFIRMED.
NOTES
[1] This figure was reduced to $30,000 effective 1988.
[2] The breach alleged by plaintiff consisted of failure to supply parking adequate to the expected audience; failure to open more than one entrance to the Fair Grounds property; failure to open two additional gates available at the single open entrance; failure to observe and act upon the visible traffic backlog that developed prior to the opening of the gates; failure to open the gates prior to 11:00 to accommodate the observable traffic build-up that occurred prior to the opening; unauthorized use of the public streets and interstate highway as temporary parking for the Jazz Fest; negligence of the Foundation-hired police detail in managing traffic conditions that Fair Grounds and Foundation knew would occur; and failure to post warnings on I-610 as motorists approached what Fair Grounds and Foundation reasonably expected to be a total stoppage of traffic in the travel lane.
[3] Barry, V.E. and Soccio, D.J., Practical Logic, 3rd ed. 1988, at p. 244. In discussing fallacies of causation, the authors write:

"As an absurd example, suppose that after breaking a vase, a person fell and broke a leg. If we inferred that breaking the vase caused the accident, we'd be guilty of the post hoc fallacy. A more serious example is found in Egyptian history. Egyptians used to worship a bird named the ibis because each year, shortly after flocks of ibis had migrated to the banks of the Nile, the river overflowed its banks and irrigated the soil. The Egyptians believed the ibis caused the flood water, when of course both the birds' migration and the river's overflow were attributable to the change of season."
[4] While geographic remoteness alone does not always preclude causation in fact or existence of a duty, the liability in negligence of remote defendants generally is based upon a relationship such as vendor/vendee or manufacturer/user that is cognizable by reason of statutory or jurisprudential principle. Such a relationship is absent in this case.
[5] On Application of Magic City Post No. 24, American Legion, and Scottsdale Insurance Co.Rehearing Denied. On Application of Scott Blair, et al.Rehearing granted for the sole purpose of clarifying original judgment. The judgment of the trial court is amended to reflect the solidary liability of the American Legion with the Washington Parish Sheriff's Department for the 25% of fault assessed against the deputies of that department, as well as the independent liability of American Legion for the 10% of fault assessed against it as a joint tort-feasor for its own negligence. As amended, the trial court's judgment is otherwise reinstated in full.