716 So.2d 1 (1998)
Omer Wayne CLARK, In His Capacity as Curator of Paula Lynn Clark
v.
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS and Department of Revenue and Taxation of the State of Louisiana.
No. 96 CA 2737.
Court of Appeal of Louisiana, First Circuit.
February 20, 1998.
Rehearing Denied April 2, 1998.
Bob Broussard, Kenneth N. Hawkins, Kevin P. Tauzin, Lafayette, and Allen J. Myles, Plaquemine, for Plaintiff-Appellee Omer Wayne Clark.
Norman F. Pizza, David Shaw, Christopher J. Shenfield, New Orleans, and Terry M. Irby, Special Assistant Attorney General, Baton Rouge, for Defendants-Appellants Department of Public Safety and Corrections and Department of Revenue and Taxation of the State.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
LOTTINGER, Chief Judge.
Defendant, State of Louisiana, through the Department of Public Safety and Corrections (DPS), appeals a judgment of the trial court in favor of Omer Clark, individually and in his capacity as curator for Paula Clark, and Linda Clark (collectively, plaintiffs).

FACTS AND PROCEDURAL HISTORY
On July 8, 1965, Lorraine Givens (Ms. Givens) filled out a renewal application for a driver's license with DPS. This application contained a series of questions including: "Have you ever suffered from epilepsy, fainting spells or dizzy spells? Which? _____. Are you now cured?" Ms. Givens indicated on her application that she suffered from epilepsy and affirmatively stated that she was cured. The application also asked, "Do you have any physical or mental defects that would make it difficult for you to operate a *2 Motor Vehicle Safely?" Ms. Givens responded to this question in the negative. It was observed by the examiner on the application that there were "no visible contusions from epileptic seizures." Ms. Givens was issued a driver's license on this date without restrictions.[1]
Ms. Givens' driver's license was automatically renewed in 1969, 1977, 1981 and 1985 without further inquiry into her medical condition. Prior to 1989, DPS did not require that an application be completed for the renewal of a driver's license. In May of 1989, DPS put into effect policies which required an inquiry into the medical situation of all new or renewal applicants for a driver's license. On June 4, 1990, Ms. Givens filled out an application for the renewal of her driver's license. On this application, question # 7 asked, "Have you ever experienced any loss of consciousness other than normal sleep?" Ms. Givens answered "No" to this question. Question # 8 in this application asked, "Do you currently have any physical or mental condition which could impair your ability to operate a motor vehicle safely?" Ms. Givens answered "No" to this question. Ms. Givens' driver's license was renewed on this date.
On October 13, 1991, Ms. Givens was travelling eastbound on Hwy. 190 in West Baton Rouge Parish. Farrah Givens, Ms. Givens' daughter, was seated in the front passenger seat. Paula Clark, a friend of Farrah, was seated in the rear passenger seat. While driving this vehicle, Ms. Givens had a seizure, which caused her to leave the roadway and strike an oak tree. Upon impact, Paula Clark was thrown from the rear passenger seat into the windshield, and was critically injured. Farrah suffered minor injuries. Ms. Givens was killed as a result of the accident.
Plaintiffs filed suit, originally naming several parties as defendants, but all defendants were dismissed prior to trial except the remaining defendant, DPS.[2] Following a bench trial, the trial court issued written reasons for judgment wherein it found, in pertinent part, as follows:
This court finds that the defendants in question are liable for issuing a license to Lorr[ia]ne Givens without conducting any investigation into her current medical condition and for failing to inquire about her current medical condition as it relates to epilepsy specifically, since the date of the initial issuance of the license.
This court finds as the court in Fowler v. Roberts, Supra, that "the Department of Public Safety and Corrections has a duty, when it knows that an applicant for a driver's license has a seizure disorder that may be dangerous either at present or in the future to adopt reasonable procedures designed to ensure safety on highways not only in initial issuance of license but, also in continuation of authority to drive"....
This court further finds that the defendants breached the duty owed to plaintiff, a passenger in a car driven by Lorraine Givens by issuing Lorraine Givens a license without requiring a medical report, by subsequently renewing her license without asking her about the then present condition of her illness, and by failing to place any particular restrictions on her license, upon initial issuance in such a manner as to alert future licensing officers of the need for a medical evaluation to determine the current state of her epileptic condition and her ability to safely operate a motor vehicle.
....
Finding that defendant breached its duty and that the plaintiff, Paula Clark, was within the scope of protection of that particular duty, the issue is: whether that breaching of duty was a legal cause of plaintiff's injuries. Pursuant to the testimony of Dr. Tucci that `it was to a degree of medical probability that what Ms. Givens *3 experienced prior to the accident was an epileptic event and the testimony of Dr. Suarez, coroner, who opinioned [sic] that based upon the testimony of the Witnesses and his findings from his autopsy that epilepsy was probably the cause of the accident. This court finds that had Lorraine Givens not been issued a driver's license she would not have been driving and, subsequently, she would not have been in a position to suffer the epileptic seizure which caused the accident injuring the plaintiff. (Emphasis in original).
The trial court further found that Ms. Givens knew that seizures would affect her driving and failed to exercise ordinary care for her safety and the safety of others in driving when she knew she had a medical condition which could impair her ability to safely drive. The trial court determined that Ms. Givens was 50% at fault.[3]
The trial court awarded plaintiffs damages as follows: past lost wages, $31,967.29; future lost wages, $127,023.00; life care plan, $4,112,772.00; loss of consortium to each parent (Omer and Linda Clark), $150,000.00; and general damages, $1,000,000.00.
It is from this judgment that DPS now appeals.

DISCUSSION
In this case, the trial court found DPS liable to plaintiffs for negligently issuing a driver's license to Ms. Givens. For a plaintiff to recover on a negligence theory, plaintiff must affirmatively answer the following questions:
(1) Was the conduct in question a cause-infact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120, 1122 (La.1987).

DUTY
Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993).
In the present case, the trial court imposed the same duty on DPS that was articulated in Fowler v. Roberts, 556 So.2d 1 (La.1989). In Fowler, Roberts made an initial application for a Louisiana driver's license on October 31, 1977. He disclosed on this application that he had been denied a Louisiana driver's license in 1975 because of his seizures. Roberts voluntarily disclosed on this application that he had epilepsy, and he was required to submit a medical report from his doctor verifying that he had been seizure-free for one year. He also indicated that he was under regular medical care, and was taking medication to control his condition. The medical report also contained his doctor's opinion that he was able to drive safely from a medical standpoint. Accordingly, Roberts was issued a regular driver's license without any indication thereon to alert anyone that he was under medical care and was taking medication for seizures. Several years later, his license was automatically renewed without any inquiries as to his current health. It was established at trial that DPS, in 1980, waived all medical reports for physically handicapped persons renewing their drivers' licenses. At the time of Roberts' renewal, his condition had deteriorated to the point that his medication could no longer control the seizures, which he was experiencing regularly. In 1983, one of Roberts' seizures caused him to be involved in a three-car collision that killed two individuals and seriously injured three others.
In Fowler, the trial court found that DPS had a duty to regulate evaluations and screenings of seizure-prone drivers before original or renewal licenses were issued, and that DPS had breached its duty. The Second Circuit affirmed the decision of the trial court. See Fowler v. Roberts, 526 So.2d 266 (La.App. 2nd Cir.1988).
*4 The supreme court granted writs and affirmed, stating as follows:
We hold that a driver's licensing agency which issued a license to an applicant known to be subject to a condition that produced seizures in the past and was likely to do so in the future, which failed to institute reasonable procedures for monitoring the condition of the driver, and which automatically reissued the license three years later without inquiry into the driver's current condition, may be held liable to motorists injured in an accident caused by the driver's operation of a vehicle while under the effects of a seizure.
Fowler v. Roberts, 556 So.2d 1, 3 (La.1989).[4]
After a thorough review of the evidence, we find that the duty set forth in Fowler v. Roberts is inapplicable to the facts of the present case.
As noted earlier, on her 1965 renewal application, Ms. Givens indicated that she had epilepsy and that she had been cured.[5] The trial court found that Ms. Givens' indication that she had epilepsy alone warranted a medical examination under La. R.S. 32:424[6] and a restriction under La. R.S. 32:423.[7] The trial court noted that if Ms. Givens' license had been flagged upon its issuance indicating that she had epilepsy, that fact would have been known in subsequent renewals. The trial court also noted that if Ms. Givens had submitted to a medical examination, her statement of her condition being cure would have been confirmed or denied.
Initially, we note that Fowler involved the initial issuance of a license to an applicant known to be subject to a condition that produced seizures in the past and was likely to do so in the future. In the case before us, plaintiffs failed to establish that DPS knew in 1965 that Ms. Givens was subject to such a condition. At trial, plaintiffs proved that Ms. Givens indicated on her application in 1965 that she had epilepsy and that she was cured. Plaintiffs offered no evidence that DPS knew about the condition of epilepsy, and any of its effects.[8] More particularly, plaintiffs offered *5 no evidence as to what the medical community knew about this condition in 1965. Plaintiffs offered the testimony of several physicians who indicated that, to their knowledge, epilepsy was not curable. However, none of this testimony specifically addressed the knowledge and beliefs of the medical community in 1965.
Furthermore, Fowler dealt with statutes and DPS procedures which were not in existence at the time Ms. Givens was issued a license in 1965. Fowler dealt with the issuance of an initial driver's license pursuant to La. R.S. 32:403.2, which was added by Acts 1968, No. 273, § 9 and presently provides as follows:
Every physically or mentally handicapped person applying for a license under the provisions of this Chapter for the first time shall attach to his application a detailed medical report, or a report from an optometrist if it is a visual defect, from a duly licensed physician indicating the severity of his disability and the limitations imposed thereby which might impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. The department may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter, except for a person subject to R.S. 32:403.4.
At the time Ms. Givens was issued a license in 1965, La. R.S. 32:403.2 had not been enacted. In fact, the laws governing the issuance of driver's licenses did not specifically require that applicants provide medical reports or submit to medical examinations.[9] The only type of examination referred to in the statutes in 1965 was set forth in La. R.S. 23:408 and required that the examination include a test of the applicant's eyesight, his ability to understand signs regulating warning and directing traffic, and his knowledge of the traffic regulations of the State. The examination also included an actual demonstration of the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle.
Additionally, the Louisiana Medical Advisory Board was not added until 1968 by La. R.S. 40:1351. As testified to by Mr. Breland and as provided in La. R.S. 40:1355, the purpose of the Medical Advisory Board is to advise DPS in those cases referred to it by the department with respect to the visual ability or physical condition of an applicant for a license or of a licensed driver, insofar as any impairment or disability therein may hinder such person's ability to exercise ordinary and reasonable control in the operation of a motor vehicle.
It is also unclear as to what, if any restrictions, were available for medical conditions in 1965. Mr. Breland could not state if DPS had any policy about placing restrictions on driver's licenses prior to the adoption of Policy/Procedure Statement No. 13 in 1986.[10] Mr. Breland recalled that, in 1966, DPS had the ability to restrict a driver's license "to a degree." According to Mr. Breland, DPS had a restriction of "09" which was a general code which denoted a number of situations, including a vision impairment. According to Mr. Breland, there has never been a specific *6 restriction that would be placed on a license for epilepsy.
As noted earlier, plaintiffs failed to establish that DPS knew in 1965 that Ms. Givens was subject to a condition that produced seizures and was likely to do so in the future. Thus, it was not unreasonable that the statutes in effect did not specifically require medical examinations or that DPS did not have procedures in place to monitor medical conditions.
We note that, since the issuance of Ms. Givens' driver's license in 1965, DPS has established procedures to monitor conditions such as epilepsy. According to Mr. Breland, in May of 1989, policies were put into effect to inquire about the medical condition of all drivers, whether a new applicant or a renewal applicant. Mr. Breland testified that DPS has no method of determining if a driver develops a condition which may impair their ability to drive after the initial issuance of the license so DPS must rely upon family members, doctors, etc. to notify them of any changes. Mr. Breland also testified that he was unaware of any policy of DPS which required handicapped drivers to report a worsening of their condition.
Mr. Breland testified that it would have been impossible to look back through all of the records to see if a person had stated he/she had epilepsy. In addition it is not reasonable to make DPS go back through all of the applications to find people who might have said they had epilepsy before the computer age. Mr. Breland also testified that he was unaware of any policy or procedure in place that would retrospectively determine drivers in the system who had informed DPS of their epilepsy.
The trial court also found that DPS was liable for issuing a license to Ms. Givens without conducting any investigation into her current medical condition, specifically epilepsy, since the issuance of the license in 1965. As noted earlier, Ms. Givens was specifically asked on her renewal application in 1990 if she ever experienced any loss of consciousness other than normal sleep and she responded that she had not. Ms. Givens was also asked whether she currently had any physical or mental condition which could impair her ability to operate a motor vehicle safely and she responded that she did not.
In reaching this conclusion, the trial court noted that Ms. Givens was questioned as to whether she had any conditions that would cause her to lose consciousness or impair her driving. The trial court then noted that the question was inappropriate to illicit a response as to epilepsy since all forms of epilepsy do not render one unconscious. The trial court also pointed to "the discretion of the department of public safety and corrections in formulating driver's license applications."
At trial, Mr. Breland acknowledged that previous application forms specifically asked about epilepsy. Mr. Breland also acknowledged that these two questions on the renewal application form filled out by Ms. Givens was not drawn up to elicit the specific response of epilepsy. However, Mr. Breland testified that, during the process of implementing new procedures for the issuance of licenses, it was determined that there were numerous physical and mental conditions which could affect an individual's ability to drive. Mr. Breland noted that in formulating these procedures, he was aware of the Fowler decision, so the goal was to establish reasonable procedures. Mr. Breland testified about the problems inherent in listing the possible physical and mental conditions which could affect an individual's ability to drive. Mr. Breland noted that the possible conditions were numerous and pointed out the difficulty in determining whether to identify a condition by its medical name or its common name. Therefore, it was decided that a combination of these two questions, which were formulated to be as general as possible, would encompass a myriad of conditions.
There was medical testimony at trial which established that not all types of epilepsy causes an individual to lose consciousness.[11] *7 In fact, the trial court relied upon this testimony in determining that the question about loss of consciousness was inappropriate to elicit a response of epilepsy. However, as testified to by Mr. Breland, it is a combination of the two questions on the renewal application, and the answers to these questions, that must be considered. Dr. Tucci testified that there were some people who might believe that they are cured because they are being treated for a disorder and think of the disorder as not being there anymore. Thus, some individuals with epilepsy might answer that they do not currently have a physical or mental condition which could impair their ability to operate a vehicle safely. However, the record reflects, and the trial court found, that Ms. Givens knew that her ability to drive a vehicle was impaired by her condition.
Ms. Givens began experiencing seizures in her early teens and had been on medication throughout her lifetime.[12] According to family members, Ms. Givens never went an entire year without suffering from a seizure. Ms. Givens' seizures were primarily at night, although she did suffer from seizures during the day. It was also established that after Ms. Givens suffered a seizure, she would not drive for several days.
The record indicates that in January of 1989, she saw Dr. Douglas Shepard, a neurologist, apparently because her seizures had increased over the holidays.[13] Ms. Givens was diagnosed with a complex partial seizure disorder. Ms. Givens was seen by Dr. Shepard in June of 1989, again because of an increase in seizure activity. Ms. Givens was monitored using a video and an electroencephalogram (EEG) in July of 1989.
In February of 1990, Ms. Givens was seen by Dr. James Tucci, a neurologist, because she was suffering from recurring seizures. Dr. Tucci opined that the recurrent seizures called for a higher dose of anti-convulsion medication. Based upon this opinion, Dr. Tucci stated that he did not believe that Ms. Givens could operate a automobile safely.[14] According to Ms. Givens' history, Dr. Tucci noted that after a seizure, Ms. Givens' postseizure period, in which she would not return to normal consciousness, would last from three to four days.
Accordingly, DPS had no duty, statutory or otherwise, to take the actions dictated in Fowler when Ms. Givens was issued a renewal license in 1965. Additionally, plaintiffs have not articulated any other basis for imposing a duty on DPS for actions taken subsequent to the issuance of this renewal license. Therefore, DPS is not liable to plaintiffs for its issuance of a renewal license to Ms. Givens in 1965 or the subsequent issuance in 1990.
But even assuming DPS had a duty to take action as dictated in Fowler, the fact that Ms. Givens suffered seizures, knew that she suffered seizures, and as a result thereof restricted her driving for several days after each seizure, her answers to the questions in her license renewal application in 1990 constitute an intervening cause which becomes the legal cause of the accident.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed. Costs of this appeal are assessed to plaintiffs.
REVERSED AND RENDERED.
NOTES
[1] The record reflects that in 1965, if an applicant stated that he had epilepsy, it was the policy of DPS to require the examiner to ask how long the applicant had been seizure free. At that time, an applicant had to be seizure free for two years in order to get a license. Ms. Givens' 1965 application does not contain any statement that she had been seizure free for two years nor is there any notation by the examiner that the question was posed to Ms. Givens.
[2] Other defendants were the Department of Revenue and Taxation and the Succession of Lorraine Givens.
[3] The trial court did not assess a specific percentage of fault to DPS.
[4] On rehearing, the supreme court determined that the discretionary function exception to governmental liability did not apply to immunize DPS for its negligence. DPS had interpreted the authority granted by La. R.S. 32:403.2 as allowing a blanket waiver of all medical reports on physically handicapped persons applying for renewal licenses.
[5] We note here that, contrary to the finding of the trial court, the application filled out by Ms. Givens in 1965 was clearly for the renewal of a license, not the initial issuance of a license. On the application, there are two boxes marked "New" and "Renewal." The box marked "Renewal" is checked on this application. Additionally, the application indicates that Ms. Givens was previously licensed to operate a motor vehicle in Louisiana in 1963 under the name of "Anne B. Achord Goodman." The application further indicates that Ms. Givens took an examination for a license in "19631960." There is no evidence as to when or where Ms. Givens was first issued a driver's license in Louisiana.
[6] La. R.S. 32:424 provides as follows:

The department, having good cause to believe that a licensed driver or chauffeur is incompetent or otherwise not qualified to be licensed, may upon written notice of at least ten days to the licensee require him to submit to an examination. Upon the conclusion of such examination the department shall take action as may be appropriate and may suspend or revoke the license of such person or permit him to retain such license, or may issue a license subject to restrictions as permitted under R.S. 32:423. Refusal or neglect of the licensee to submit to examination shall be ground for suspension or revocation of his license.
[7] In 1965, La. R.S. 32:423 provided as follows:

The department upon issuing a driver's or chauffeur's license shall have authority whenever good cause appears to impose restrictions suitable to the licensee's driving ability with respect to the type of, or special mechanical control devices required on, a motor vehicle which the licensee may operate or such other restrictions applicable to the licensee as the department may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee.
The department may either issue a special restricted license, or may set forth such restrictions upon the usual license form.
The department may upon receiving satisfactory evidence of any violation of the restrictions of such license suspend or revoke the same but the licensee shall be entitled to a hearing as upon a suspension or revocation under this Chapter.
No person shall operate a motor vehicle in violation of the restrictions imposed in the license issued to him.
[8] Mr. Robert Breland, Deputy Assistant Secretary of the Office of Motor Vehicles, offered testimony on this issue which was, at best, inconsistent. Mr. Breland testified that DPS could have known that epilepsy was a seizure disorder which could foreseeably pose a risk, either at present or in the future, to the motoring public. Mr. Breland also testified that in 1965 DPS did not have the benefit of the Medical Advisory Board and thus did not have knowledge of its curability. It was noted several times during Mr. Breland's testimony that he did not begin his employment as a driver's examiner with the Office of Motor Vehicles until March of 1966.
[9] Mr. Breland testified that he "believed that medical exams were in existence back then."
[10] Policy/Procedure Statement No. 13 imposes a variety of numerical restrictions "to compensate for a handicap which would hinder the safe operation of a motor vehicle." Included in Policy/Procedure Statement No. 13 is Restriction 27 which provides as follows:

When a driver has a physical or mental condition which is considered to be of a progressive or high risk nature, this restriction is needed. This is added on recommendation of a doctor. This restriction will also be set up by Headquarters for calendaring. This restriction will be frequently recommended by doctors on epileptic cases. If the driver fails to submit [to] a timely satisfactory medical at the specified date, the driver's license will be indefinitely suspended. (Emphasis ours).
[11] According to Dr. James Tucci, there are patients who have had complex partial seizures, as Ms. Givens did, who might answer the question incorrectly because they do not understand that the alteration of consciousness they suffer as a loss of consciousness. In this type of seizure, the patient suffers from a change in contact with his surroundings. For example, the patient may no longer be aware of his surroundings, but is still conscious of himself.
[12] Despite Ms. Givens' history of epilepsy, the record before us contains no medical records for Ms. Givens prior to 1989.
[13] Introduced into evidence were the records from Ochsner Clinic which reflect that Ms. Givens was treated by Dr. Shepard. Dr. Shepard did not testify at the trial.
[14] Dr. Tucci testified that it was his standard approach to recommend to patients that they not operate any heavy machinery or motor vehicles or swim by themselves although he never documented this recommendation in the records. Farrah Givens testified that she did not recall any doctor telling her mother that she could not drive.